UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN L. LOVE,

                                    Petitioner,

                    v.

DANIEL F. MARTUSCELLO,

                                    Respondent.
_____

DECISION AND ORDER

17-CV-6244L

## INTRODUCTION

Petitioner John L. Love, a prisoner in respondent's custody, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. # 1). Love also has filed renewed motion to amend (Dkt. # 42), which includes requests for appointment of *pro bono* counsel and an evidentiary hearing. For the following reasons, the motion to amend is denied, the requests for appointment of counsel and an evidentiary hearing are denied, and the petition is dismissed.

## BACKGROUND

I.      **The State Court Criminal Proceedings**

        A.      **The Indictment and Trial**

        A Monroe County grand jury returned an indictment charging that on November 21, 2010, Love engaged in sexual intercourse with his daughter, Z.A., by forcible compulsion in violation of N.Y. Penal Law ("P.L.") § 130.35(1); and that on November 21, 2010, being 21 years of age or

more, he engaged in sexual intercourse with Z.A., who was less than 17 years of age, in violation of P.L. § 130.25(2).

### 1.      The People's Case

Z.A., a high school student born in 1994, testified that Petitioner is her father but they rarely spoke and never lived together. They reconnected on social media in the fall of 2010, and saw each other a couple of times. On the evening of November 20, 2010, Petitioner picked her up so she could spend the night at the house on Briggs Street he shared with his mother, Willie Mae Love. (T. 224-28, 230-32).[1] That evening, Z.A. and her grandmother watched television for a while. After Willie Mae fell asleep, Z.A. went into Love's bedroom and played a game on his cell phone while he watched television. Eventually, Z.A. fell asleep while sitting on the floor. (T.232-34).

A bit later, Z.A. awoke to find herself in bed with a shirtless Love, who was pulling off her leggings and kissing her. She turned away and repeatedly told him to stop but he covered her mouth with his hand and told her to be quiet. He positioned his body in between Z.A.'s legs, and she felt his penis inside of her vagina. Z.A. tried to push him off but she could not. He asked if she wanted him to stop. Z.A. said yes, but he continued to penetrate her. Eventually, he stopped and got up. He said he was sorry, knelt on the floor, and started praying. (T.236-39, 269-71).

Z.A. immediately got dressed and left the house. Love followed her in his car, begging her to get in, but she refused. About five blocks away, Z.A. found a payphone and called 911, telling the 911 operator that she had just been "raped by [her] dad" at his house on Briggs Street. Throughout the seven-minute call, a recording of which was admitted into evidence as People's Exhibit 1, Z.A. sobbed hysterically, urging the 911 operator to "hurry" and send the police. She

---

[1]      Citations to "T." and "S." refer to pages of the trial transcript and sentencing transcript, respectively. These transcripts were filed by Respondent in one volume (Dkt. # 24). Citations to "SR." refer to the Bates-stamped page numbers of the state court records filed by Respondent (Dkt. # 23).

told the operator that Love was on "on the corner," and screamed, "I'm not getting in the car!" (Dkt. # 13-1 at 4). Z.A. and the 911 operator both identified the 911 recording played at trial as a full and complete recording of the call and identified their own voices as the ones on the recording. (T. 239-41, 218-22).

Once police and paramedics responded, Z.A. was taken by ambulance to the hospital, where she underwent a forensic examination about two hours later by Sexual Assault Nurse Examiner Debra Crasti. (T. 239-40, 274-76, 340). The nurse testified that Z.A. told her "that while she was asleep," "her father tried to have sex with her, and that he kissed her, and that she had a headache, and she had pain in her vagina." The examination took longer than usual because Z.A. was very emotional and was crying and shaking. (T. 332-33, 337, 340-51).

After the victim's medical records were admitted into evidence, Nurse Crasti testified about the indicators of physical trauma she observed when she conducted a pelvic examination of the victim. In her contemporaneous notes, Nurse Crasti recorded injuries that included vaginal irritation and a torn hymen. Additionally, she recalled seeing that Z.A.'s posterior fourchette had a tear but did not mark it on her notes at the time. During her direct examination, Nurse Crasti marked the diagram of Z.A.'s genital area with the injuries she observed, including the torn posterior fourchette. On cross-examination, Nurse Crasti explained that she had made a "mental note" of the tear in the posterior fourchette at the time of the examination but had not marked in her notes at the time. Based on her recollection at trial, she marked the torn posterior fourchette on the diagram in court. (T. 354-55). Nurse Crasti also documented bleeding in Z.A.'s cervix and reddening of her vagina, labia majora, clitoris, labia minora, anal folds, and urethra. The redness was not a normal finding but was consistent with trauma or nonaccidental injury. Nurse Crasti testified that the tears in Z.A.'s hymen and posterior fourchette and the bleeding in her cervix were

3

consistent with recent, forcible penetration of her vagina. The types of injuries observed on Z.A. would likely have healed within a day. (*See* T. 347-51, 354-55, SR. 154, 202).

Meanwhile, as part of his investigation, Rochester Police Department Officer Adam Johnston went to 33 Briggs Street, where Love answered the door. When asked if he knew why the police were there, Love responded, "Because I inappropriately touched my daughter." Officer Johnston then drove Love to the police station where he completed a prisoner data form for Love indicating that Love had a muscular build, was about 5'3" tall, and weighed about 190 pounds. (T. 277-82).

After being issued *Miranda* warnings and waiving his rights, Love gave oral and written statements to Rochester Police Department Investigator Mario Correia. When asked why he thought he was at the police station, Love told Investigator Correia, "I guess I touched her, or I was told I touched her inappropriately." In his oral and written statements, Love said that he had been out drinking with friends that evening and that when he got home, Z.A. had fallen asleep in his bedroom. Love claimed that he also fell asleep but was later woken up by Z.A. crying. Love said that when he asked Z.A. what was wrong, she told him not to touch her anymore but would not explain further. According to Love, he told Z.A. that if he touched her inappropriately, he was sorry. Love said that though he had been drinking, he was lucid and knew he did not have sex with his daughter. (T. 300-08, People's Exhibit 3, SR. 41-43).

### 2.    The Defense Case

The defense called Willie Mae, who testified that she lived with her son, did not work, and was supported financially by Love. Willie Mae claimed that Love had gone out for most of the evening with some friends while she and Z.A. spent the evening watching the television shows "Cops" and "America's Most Wanted." Z.A. was wearing leggings and a tank top. According to

Willie Mae, she eventually got annoyed with the noise of the video game Z.A. was playing on her phone and told her to go to a different room.

Love later woke Willie Mae and asked her to go look for Z.A. When she caught up to Z.A. at the payphone on Chili Avenue. Z.A. was wearing a different outfit—pink hoody, pink jeans, and sneakers. Willie Mae tried to coax Z.A. into her car, but Z.A. refused. Both Z.A. and Willie Mae were crying. Willie Mae stayed with Z.A. until the police arrived. (T. 371-74, 383-85).

### 3.     The Verdict and Sentence

The jury returned a guilty verdict on both counts of the indictment. (T. 471). The trial court imposed an aggregate determinate term of fifteen years in prison to be followed by five years of post-release supervision. (S. 11). Love claimed that Z.A. had let someone into the house who actually committed the rape. (S. 8).

### B.     Direct Appeal

Represented by new counsel on appeal, Love argued that (1) the verdict was against the weight of the credible evidence; (2) the trial court erred in admitting the 911 call recording; and (3) the prosecutor made remarks during opening and closing arguments that improperly shifted the burden of proof and vouched for Z.A.'s credibility. (SR. 1-30). The conviction was affirmed on direct appeal. *People v. Love*, 134 A.D.3d 1569, 1570 (4th Dept. 2015), *leave denied*, 27 N.Y.3d 967 (2016); (SR. 178-79).

### C.     The Motions to Vacate

On August 29, 2014, while his direct appeal was still pending, Petitioner filed a *pro se* motion to vacate the conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, arguing that trial counsel was ineffective on several grounds. On the advice of appellate counsel, Love withdrew the § 440 motion. (SR. 205). After his direct appeal was completed, he

resubmitted his C.P.L. § 440.10 motion (SR. 206-17), incorporating his previous motion's arguments. (SR. 212). The Monroe County Court (Ciaccio, J.) denied the motion in a written order dated August 5, 2016. The Appellate Division denied leave to appeal on September 7, 2016.

During the pendency of this habeas proceeding, Love filed another *pro se* C.P.L. § 440.10 motion on September 21, 2020, asserting that he is actually innocent; that the prosecutor forged documents and tampered with evidence and suborned perjury from a police witness; and trial counsel committed a host of errors. (SSR. 1-57).[2] The Monroe County Court (Dollinger, J.) denied the motion on April 9, 2021. (SSR. 73-77). The Appellate Division denied leave to appeal. (SSR. 185).

## II.    The Federal Habeas Proceeding

### A.    The Original Petition

The petition raised the following for grounds for habeas relief: (1) the verdict was against the weight of the credible evidence; (2) the trial court erroneously admitted the recording of the 911 call; (3) the prosecutor committed misconduct during opening and closing arguments; and (4) trial counsel was ineffective for not utilizing a photograph of Z.A. captioned with the words "ee ii consider maa self innocent until proven guiltee" that she posted on Facebook. (*See* Dkt. # 1, ¶ 12).

Respondent filed a response (Dkt. # 13) along with the state court records (Dkt. # 23) and trial transcript (Dkt. # 24) under seal. Love filed a traverse (Dkt. #14). The case was randomly assigned to District Judge Frank P. Geraci, Jr., who issued a decision and order denying the petition. (Dkt. # 19). Love then filed a motion (Dkt. # 25), arguing that vacatur was warranted because Judge Geraci, in his previous capacity as a state judge, had presided over petitioner's trial.

---

[2]    Citations to "SSR." refer to the Bates-stamped page numbers of the supplemental state court records filed by Respondent (Dkt. # 46).

Ultimately, Judge Geraci vacated the judgment and directed that the case be reassigned. (Dkt. # 26). The matter subsequently was transferred to me, and I permitted Love an opportunity to file additional pleadings. (Dkt. ## 31, 33). Love filed motions to strike and to appoint counsel (Dkt. ## 36, 37), which I denied. (Dkt. # 38).

### B.      Motion to Amend

On November 11, 2021, Love filed a pleading purporting to be a motion to amend, which consisted of a memorandum of law (Dkt. # 40) and copies of documents (Dkt. ## 40-1, 40-2) related to his second C.P.L. § 440.10 motion. I issued a decision and order (Dkt. # 41) on January 3, 2022, dismissing the motion to amend without prejudice with leave to amend. In particular, I explained that that the motion to amend failed to comply with Federal Rule of Civil Procedure 15 ("Rule 15") because it did not include a proposed amended petition listing each of the grounds on which habeas relief was sought and did not address Rule 15(c)(1)(B)'s relation back requirement.

### C.      Renewed Motion to Amend and Proposed Amended Petition

Love timely filed a proposed amended petition (Dkt. # 42 at 1-10),[3] notice of motion (*id.* at 11), affirmation in support (*id.* at 12-22), memorandum of law (*id.* at 23-53), and 44 pages of exhibits (Dkt. # 42-1). The exhibits in Dkt. # 42-1 are identical to those contained in Dkt. # 40-1. In Paragraph 22 of the form petition which asks the petitioner to state every ground on which he claims to be held unlawfully, Petitioner appears to raise four new grounds for relief with multiple subgrounds: (1) he is actually innocent; (2) the prosecutor committed misconduct; and (3) trial counsel was ineffective for various reasons. (Dkt. # 42 at 7-8; 42-46). Love did not include his original claims in Paragraph 22 or attach pages listing the original claims. Instead, in Paragraph

---

[3]      Because Dkt. # 42 consists of two documents with two sets of page numbers (one for the form petition and one for the affirmation in support), the Court will refer to the pagination automatically generated by the CM/ECF system, printed in the document header.

24, which asks whether the petitioner has any other currently-pending petition or appeal, Petitioner states that he has a habeas corpus petition in this Court. (Dkt. # 42 at 9). He lists the original habeas claims under Paragraph 24(d). *Id.*

Since Love is *pro se*, he is entitled to a special solicitude when the Court reviews his submissions. *See McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). "This obligation entails, at the very least, a permissive application of the rules governing the form of pleadings." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Because Love included his original claims in the amended petition, albeit not in the correct paragraph on the form petition, I will construe the proposed amended petition as continuing to press the original habeas claims in addition to the new claims.

Respondent filed a letter brief in opposition to the motion to amend (Dkt. # 45), along with the supplemental state court records (Dkt. # 46) under seal. Respondent chiefly argues that the motion to amend should be denied because the new claims are untimely and do not relate back to the original petition, that the claim of actual innocence is inadequate to excuse Petitioner's noncompliance with the limitations period, and that Petitioner has been dilatory in raising his proposed new claims. Petitioner filed a traverse (Dkt. # 47) with exhibits (Dkt. # 48) responding to Respondent's arguments (Dkt. # 47 at 2-16) and arguing the merits of his proposed new claims (*id.* at 16-28).

## DISCUSSION

### I.    The Motion to Amend (Dkt. # 42)

#### A.    Rule 15 Standard

"Federal Rule of Civil Procedure 15, made applicable to habeas proceedings by [28 U.S.C.] § 2242, Federal Rule of Civil Procedure 81(a)(2), and Habeas Corpus Rule 11, allows pleading

amendments with 'leave of court' any time during a civil proceeding. *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Fed. R. Civ. P. 15(a)). "Before a responsive pleading is served, pleadings may be amended once as a 'matter of course,' i.e., without seeking court leave." *Id.* (citing Fed. R. Civ. Proc. 15(a)). "Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings 'ar[i]se out of the [same] conduct, transaction, or occurrence.'" *Mayle*, 545 U.S. at 655 (quoting Fed. R. Civ. Proc. 15(c)(2)).

I first will address the timeliness of the original petition and the proposed amended petition. If both are timely, then there is no need to consider the "relation back" doctrine. As discussed further below, I find that while the petition (Dkt. # 1) is timely, the amended petition (Dkt. # 42) is untimely. Love does not have a colorable gateway claim of "actual innocence" that would allow him to evade the limitations bar, and he has not demonstrated entitlement to equitable tolling of the statute of limitations period. The new ineffective assistance of counsel claim and prosecutorial misconduct claim do not "relate back" to the original petition and therefore are untimely. Therefore, adding them to the petition would be futile. The actual innocence claim is not cognizable on federal habeas review, meaning that adding it to the petition also would be futile. Therefore, I will deny the motion to amend in its entirety.

### B.    Timeliness of the Proposed New Claims

The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs this application for a writ of habeas corpus, contains a one-year statute of limitations that runs from the latest of the following four events. *See* 28 U.S.C. § 2244(d)(1)(A)-(D). Love does not suggest that he was impeded from filing in a timely fashion by any state action. Likewise, he does not rely on any right made retroactively applicable on collateral review. Therefore, subsections (B) and (C) of Section 2244(d)(1) do not apply. The only possible start-dates are set forth in subsection (A),

the date on which the conviction became final; or (D), the date when the claim's factual predicate could have been discovered through due diligence.

For purposes of Section 2244(d)(1)(A), a state conviction becomes "final" when the United States Supreme Court denies an application for a writ of *certiorari* or when the time to seek *certiorari* has expired, which is 90 days following the date on which direct review by the state's highest court is complete. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012); U.S. Sup. Ct. R. 13(1). Here, the New York Court of Appeals denied leave to appeal on March 23, 2016. *People v. Love*, 27 N.Y.3d 967 (2016). Because Love did not file a petition for a writ of *certiorari*, his conviction became final 90 days later, on June 21, 2016.

The one-year limitations period would have expired on June 21, 2017, absent any statutory tolling under 28 U.S.C. § 2244(d)(2). That subsection provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). "A state-court collateral attack on a conviction cannot toll an already expired limitations period; nor does a belatedly filed state-court collateral attack serve to start the limitations period running anew." *Bell v. Herbert*, 476 F. Supp. 2d 235, 244 (W.D.N.Y. 2007) (citing *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (*per curiam*)).

Here, Love reinstated his first § 440 motion (SR. 187-21) on February 2, 2016 (SR. 207), before the limitations period began to run. The state trial court denied the motion on August 5, 2016 (SR. 260-64). For purposes of § 2244(d)(2), the § 440 motion ceased to be pending until January 5, 2017, when the Appellate Division issued its order denied leave to appeal (SR. 278). *See Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000). The statute of

limitations began running on January 5, 2017, and it expired one year later on January 5, 2018. *See Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir.), *cert. denied*, 531 U.S. 1018 (2000).

Assuming that Section 2244(d)(1)(A) supplies the start-date for the limitations period, Love's original petition was timely because it was filed on March 30, 2017. However, the initial motion to amend, filed in December 2021, was untimely by about four years. Of course, the renewed motion to amend, filed on January 22, 2022, is also untimely. There was no statutory tolling under Section 2244(d)(2) because the second § 440 motion was filed on September 21, 2020, after the limitations period expired. *See Smith*, 208 F.3d at 17.

The timeliness analysis is complicated by the fact that several of the arguments in support of the new grounds for relief are based on what is, according to Love, "newly discovered evidence" of "actual innocence." (*See* Dkt. # 42-1 at 1). Such claims could be independently timely under § 2244(d)(1)(D). *See Bonner v. Sup't, Five Points Corr. Fac.*, No. 20-CV-6906-FPG, 2021 WL 1946703, at *6 (W.D.N.Y. May 14, 2021) (finding that § 2244(d)(1)(D) could be applicable because petitioner claimed to "recently discovered exculpatory evidence in the form of call records for his cell phone") (citing *McQuiggin v. Perkins*, 569 U.S. 383, 388-89 (2013) (stating that if the petition alleges newly discovered evidence, the filing deadline is calculated based on § 2244(d)(1)(D)).

"Congress did not provide a definition of the term 'factual predicate,' as used in § 2244(d)(1)(D)[,]" but the Second Circuit has observed "that a factual predicate consists only of the 'vital facts' underlying the claim." *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (quoting *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007); citing *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998)). "Conclusions drawn from preexisting facts, even if the conclusions are themselves new, are not factual predicates for a claim." *Id.* "Newly discovered evidence is, by

definition, incapable of discovery through counsel's [or a petitioner's] due diligence before or during trial." *Hector v. Greiner,* No. 99 CV 7863 FB, 2000 WL 1240010, at *1 (E.D.N.Y. Aug. 29, 2000) (citing *United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000)). Thus, "[e]vidence in existence at an earlier date, though perhaps unknown to a petitioner, cannot later be described as newly discovered." *Id.* (citing *United States v. Jacobs*, 475 F.2d 270, 286 n.33 (2d Cir. 1973); other citations omitted).

According to Petitioner, the allegedly "new" evidence consists of fourteen items, set forth in his "List of Exhibits for Memorandum of Actual Innocence" (Dkt. # 42-1 at 1):

"1.      Exhibit A.1-7 Sexual Assault Documentation Form (page 7 is forged).
2.      Exhibit B.1-3 is the Rochester Public Safety Lab; negative-rape kit results.
3.      Exhibit C is the police report recorded by Inv. Mario Correia.
4.      Exhibit D is the uncovered TV Guide of November 20, 2010.
5.      Exhibit E 1-2 is the request's that the jury only knew about and asked for.
6.      Exhibit F.1-3 is proof of illegal redaction by defense attorney and prosecutor.
7.      Exhibit G.1-3 is where the nurse manufactured evidence directed by THE PEOPLE.
8.      Exhibit H.1-4 is the DECISION AND ORDER, by the MONROE COUNTY COURT.
9.      Exhibit I is the KA 21-00817 APPELLATE DIVISION - ORDER
10.     Exhibit J.1-7 is the testimony of the SANE NURSE, D. Crasti.
11.     Exhibit K is the ENCOUNTER SUMMARY'S NEGATIVE DIAGNOSES prepared by Doctors.
12.     Exhibit L is fudged evidence of the diagnoses.
13.     Exhibit M is the HUNTLEY HEARING proof of perjury by Inv. Mario Correia.
14.      Exhibit N.1-5 testimony of complainant and Mrs. Love, about TV show and perjury proven with the TV GUIDE."

(Dkt. # 42-1 at 1; capital letters in original).

Item numbers 8 and 9, the state court orders filed in connection with the second § 440.10 motion, apparently have been attached to demonstrate that Love has completed exhaustion proceedings, not as part of his "actual innocence" claim. In any event, they are not "newly

discovered evidence" of actual innocence. As discussed below, none of the remaining items enumerated in the List of Exhibits (Dkt. # 42-1) can be considered "newly discovered evidence."

Items 1, 11, and 12 consist of the victim's medical records created during the sexual assault at the hospital and were in existence prior to trial. Items 2 (the forensic test results), 3 (a police report), 5 (two jury notes), 10 and 14 (excerpts of witnesses' trial testimony), and 13 (excerpt of a witness's suppression hearing testimony) were in existence prior to trial or were created as part of the trial itself. The factual matters contained in them were actually known by Petitioner at the time of trial.

Since the nature of some of items in Dkt. # 42-1 is unclear from Love's description of them, further explanation is required. Item 6 is an excerpt from the trial transcript in which the parties discuss, out of the jury's presence, redaction of a portion the second page of the "Encounter Summary," part of People's Exhibit 11. At trial counsel's request, the trial court agreed to redact the words "sexual assault" after the notation, "[d]ifferential diagnosis," as well as additional narrative information under the "[d]ifferential diagnosis" heading. Item 7 is an excerpt from Nurse Crasti's direct testimony during which she testified about her observations of the victim during the examination and placed markings on a diagram (the last page of People's Exhibit 11) to indicate where she observed redness and tears on the victim's genitalia. Items 6 and 7 not contain "predicate facts" that were newly discovered after trial; rather, they contain preexisting facts from which Love is drawing purportedly new legal conclusions. They do not qualify under § 2244(d)(1)(D). *See Patel v. D. Martuscello*, No. 1:10-CV-4804, 2011 WL 703943, at *3 (E.D.N.Y. Feb. 16, 2011) (stating that the limitations period under Section 2244(d)(1)(D) "deals only with the discovery of predicate facts, not their legal significance").

Lastly, item 4 purports to be a copy of "TV Guide" for the night of the incident which Love contends was not "uncovered" by his family until very recently. However, because the TV Guide existed at an earlier date, it cannot be newly discovered, even accepting his dubious assertion that it was previously unknown to him. He was also aware, through his mother's trial testimony, of the predicate facts that he is relying on the TV Guide to substantiate—the television programming schedule for the night of the incident.

The foregoing items cannot be newly discovered evidence because they were in existence prior to trial or were generated during the trial and contain factual predicates that were actually known to Petitioner. I therefore find that there is no basis on the present record to apply § 2244(d)(1)(D)'s start-date. The proposed new claims are untimely and amendment must be denied unless Love has a "gateway" claim of actual innocence that will allow him to bypass the limitations bar or the proposed new claims "relate back" to the claims raised in the original, timely claims.

### C.      Petitioner Does Not Have a Viable "Gateway" Claim of Actual Innocence

The Supreme Court has recognized that "actual innocence" can serve as a gateway to the airing of procedurally defaulted or untimely constitutional claims. *See McQuiggin*, 569 U.S. at 397-98, 401. A gateway claim of actual innocence will not pass muster under the Supreme Court's precedents unless it is both "credible" and "compelling." *House v. Bell*, 547 U.S. 518, 521 (2006). To be "credible," the claim must be supported by "*new reliable evidence*—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was *not presented at trial*." *Schlup v. Delo*, 513 U.S. 298, 324 (1995; emphases supplied). "Compelling" means that it is "more likely than not, in light of the new evidence, no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt—or to remove the double

negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

Love's claim of "actual innocence" is based on a hodge-podge of alleged gaps in the prosecution's proof, supposed inconsistencies in the witnesses' trial testimony, and made-up irregularities in the documentary evidence. (*See* Dkt. # 42-1). According to Petitioner, he is innocent because the prosecutor allegedly forged evidence by adding markings denoting additional injury to a diagram of the victim's vaginal area. (Dkt. # 42 at 25-31). He contends that the "original" version of this medical record, which he filed in support of his first § 440.10 motion (SR. 202) did not contain such markings, and that it was not until he received the state court records during this habeas proceeding that he realized there was another version of the diagram (SR. 154), which included the "new" markings and which had been introduced into evidence at trial. He theorizes that the prosecutor, in cahoots with Nurse Crasti, altered this record to exaggerate the proof that a forcible rape occurred and concludes that, but for the alleged forgery, there was insufficient proof of forcible intercourse which makes him "actually innocent."

Love's actual innocence claim is fatally deficient for several reasons. First, his allegations are based on a misreading of the record—there was no forgery of, or tampering with, evidence. As recounted in the summary of the trial testimony, Nurse Crasti testified that, during the examination of the victim, she made a mental note of the torn posterior fourchette and marked on the diagram (People's Exhibit 11) shown to her by the prosecutor. but admitted she did not mark it on the diagram at that time. (T. 348, 356-57). During his closing argument, trial counsel pointed out that on the original document, in the blank space next to the words "posterior fourchette" where, if she had actually seen a tear during the examination, she would have written "capital T for tear" but

instead "she wrote not applicable." (T. 401). Trial counsel argued that this severely undermined Nurse Crasti's credibility and urged the jury to reject her testimony.

Second, Petitioner has not come forward with any "new reliable evidence" that was "not presented at trial." *Schlup*, 513 U.S. at 324. To the contrary, his actual innocence claim is based solely evidence and testimony presented at trial. He simply argues that the jury should have weighed the credibility of the witnesses differently and drawn alternative inferences from the proof.

"[T]he jury is exclusively responsible for determining a witness' credibility[,]" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993), and making "assessments of the weight of the evidence[,]" *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). "Neither on direct appeal nor on federal habeas is a court reviewing a sufficiency of the evidence claim permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity." *Moye v. Corcoran*, 668 F. Supp. 2d 523, 539 (W.D.N.Y. 2009) (citing *Strauss,* 999 F.2d at 696; *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981)). Trial counsel already made these evidentiary arguments to the jury, which rejected them. Indeed, Petitioner's contentions do not even state a claim that the evidence was legally insufficient to satisfy due process which, in any event, would not state a colorable claim of actual innocence. *See Bousley v. United States*, 523 U.S. 614, 623-24 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.").

### D.    Petitioner Is Not Entitled to Equitable Tolling

"[I]n 'rare and exceptional circumstances'" a petitioner may qualify for equitable tolling of AEDPA's statute of limitations, so long as he establishes that "'extraordinary circumstances prevented him from filing his petition on time, and that he 'acted with reasonable diligence throughout the period he seeks to toll.'" *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004) (quoting

*Smith*, 208 F.3d at 17). The Second Circuit has identified "only a limited number of circumstances that may merit equitable tolling, such as where an attorney's conduct is so outrageous and incompetent that it is truly extraordinary, and where prison officials intentionally obstruct a petitioner's ability to file his petition by confiscating his legal papers," *id.* at 159-60 (internal citations omitted). None of these are present here.

I recognize that Love is incarcerated and *pro se*, but neither incarceration, nor lack of representation, nor ignorance of the law constitute rare and extraordinary circumstances that would merit equitable tolling. *See*, *e.g.*, *Smith*, 208 F.3d at 18 (holding that the petitioner's "*pro se* status . . . does not merit equitable tolling."); *Wilson v. Bennett*, 188 F. Supp. 2d 347, 354 (S.D.N.Y. 2002) (collecting cases holding that lack of legal knowledge and education are not sufficient); *Alvarez v. United States*, No. 14-CV-2491, 2019 WL 1428350, at *5 (S.D.N.Y. Mar. 29, 2019) ("In general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances.") (quoting *Corrigan v. Barbery*, 371 F. Supp. 2d 325, 330 (W.D.N.Y. 2005)).

Not only has Love failed to show any "extraordinary circumstances", the four-year delay between filing the petition and the amended petition is the opposite of "reasonable diligence," particularly since the factual bases for the new claims were available to him at the time of trial. Therefore, Love is not entitled to equitable tolling of the limitations period.

E.     **The Actual Innocence Claim Is Not Cognizable**

Leave to amend may be appropriately denied where amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). The futility of a proposed amendment is established where "the proposed claim could not withstand a motion to dismiss" for failure to state a claim

upon which relief may be granted. *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

It is well settled that "[t]he habeas remedy is not [a court's] to grant unless a petitioner has established a constitutional violation affecting the validity of the verdict." *Brown v. Doe*, 2 F.3d 1236, 1249 (2d Cir. 1993). "[T]he [Supreme] Court expressly stated in *Herrera* [*v. Collins*, 506 U.S. 390, 400 (1993)] that a claim of 'actual innocence' is not itself a constitutional claim." *United States v. Quinones*, 313 F.3d 49, 68 n.16 (2d Cir. 2002). Allowing Love to amend the petition to add actual innocence as a freestanding ground for habeas relief would be futile, and the request is denied. *Sutton v. Graham*, No. 11-CV-06532 MAT, 2012 WL 4103884, at *4 (W.D.N.Y. Sept. 17, 2012) (denying request to stay and amend petition to add actual innocence claim because such a claim "itself is not a freestanding cognizable ground for habeas relief") (quoting *Russell v. Rock*, No. 08-CV-1894 BMC RER, 2008 WL 5333327, at *5 (E.D.N.Y. Dec. 19, 2008)).

## F.     The Remaining Proposed New Claims Do Not "Relate Back"

In the context of federal habeas proceedings, the Supreme Court has rejected an expansive interpretation of Rule 15(c)(2)'s relation-back provision. *See Mayle v. Felix*, 545 U.S. at 656-57 (disagreeing with circuits that had defined "'conduct, transaction, or occurrence' to allow relation back of a claim first asserted in an amended petition, so long as the new claim stems from the habeas petitioner's trial, conviction, or sentence") (citations omitted). Instead, the Supreme Court explained, "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Id.* at 659 (citations omitted). An amended habeas petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650; *see also id.* at 657, 661 (finding that habeas petitioner's

voluntariness claim did not relate back to his Confrontation Clause claim because his "own pretrial statements, newly raised in his amended petition, were separated in time and type from [a witness's pretrial] videotaped statements, raised in [the] original petition").

### 1.    The Ineffective Assistance of Counsel Claim Does Not Relate Back

The "relation back" requirement "has been narrowly construed" by courts in this Circuit. *Cotton v. Burge*, No. 08-CV-453S, 2009 WL 3165868, at *3 (W.D.N.Y. Sept. 26, 2009) (collecting cases). "[I]t is not sufficient for an untimely amendment merely to assert the same general type of legal claim as in the original [habeas petition]." *Reiter v. United States*, 371 F. Supp. 2d 417, 423-24 (S.D.N.Y. 2005).

"Thus, a new ineffective assistance claim does not relate back to an earlier one that relied on a different type of attorney malfeasance." *Jenkins v. Graham*, No. 06 CIV. 10200CMJCF, 2009 WL 1119383, at *2 (S.D.N.Y. Apr. 23, 2009) (citing *Veal v. United States*, Nos. 01 Civ. 8033, 97 Cr. 544, 04 Civ. 5122, 2007 WL 3146925, at *5 (S.D.N.Y. Oct. 9, 2007)). "Absent some factual nexus with the claims asserted in the original petition, an ineffective assistance of counsel claim in an amended petition is generally seen to be 'a discrete claim based on discrete facts, i.e., . . . the arguments that counsel raised or allegedly failed to raise on appeal.'" *Sookoo v. Heath*, No. 09 CIV 9820 JGK, 2011 WL 6188729, at *5-6 (S.D.N.Y. Dec. 12, 2011) (quoting *Cotton*, 2009 WL 3165868, at *3; citing *Diaz v. Graham*, No. 07 Civ. 5379, 2011 WL 1303924, at *3 (E.D.N.Y. Mar. 31, 2011)).

Love's original claim of ineffective assistance is based on trial counsel's failure to use one of the victim's Facebook posts that allegedly demonstrated that she was fabricating the rape allegations. The new claims are based on wholly different facts and allegedly occurred during different times during the trial. Love asserts that trial counsel erred by failing to call Dr. Geoffrey

Collins and Dr. Geoffrey Everette, who purportedly "diagnosed" the victim with "alleged child sexual abuse" versus "violent rape" and would have rebutted Nurse Crasti's testimony; trial counsel erroneously agreed to redact the word "alleged" from one of the victim's medical records; trial counsel should have presented the police report that alleged "blood in underwear" and contrasted it with the "rape kit that established blood never existed or the alleged course of sexual contact that supposedly created a violent rape"; trial counsel failed to confront the victim with the TV Guide for the night of the incident; trial counsel failed to read the police report in which Investigator Correia allegedly "committed perjury"; trial counsel failed to point out any of these "inconsistencies" at trial. (*See* Dkt. # 42 at 42-43).

These new allegations do not merely supplement or amplify Petitioner's original claim that trial counsel failed to introduce the Facebook post into evidence; rather, they present a dramatically different ineffectiveness claim. In other words, the original petition did not provide Respondent with "fair notice" of the new theories of ineffective assistance of trial counsel. *See Valerio v. Phillips*, No. 02-CV-903RJAVEB, 2007 WL 4191817, at *6 (W.D.N.Y. Nov. 21, 2007) ("Both of Valerio's two proposed new claims are wholly different from the originally pled claims with regard to their timing and their underlying factual circumstances, and, accordingly, respondent could not have had 'fair notice,' . . . of the newly alleged claims.") (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 815 (2d Cir. 2000) ("[T]he pertinent inquiry . . . is whether the original complaint gave the [respondent] fair notice of the newly alleged claims.")). Since the claims of ineffective assistance which Love seeks to add are sufficiently separate and distinct from those claims originally pled that they cannot be said to arise out of the same "transaction, conduct, or occurrence" as that language was interpreted in *Mayle v. Felix*, they do not relate back.

### 2.    The Prosecutorial Misconduct Claim Does Not Relate Back

In support of the proposed new claim of prosecutorial misconduct, Petitioner alleges that the prosecutor allowed the Investigator Correia to commit "perjury during trial"; directed Nurse Crasti to "forge[] medical evidence during trial" and then "submitted to a tribunal forged evidence on the medical sheet"; and acted in concert with trial counsel to "redact[] the doctor's words from alleged," thereby "commit[ing] an act against the professional conduct of lawyers." (Dkt. # 42 at 8, ¶ 22(B)). Although the original petition asserted a claim of prosecutorial misconduct, it was based solely upon errors that occurred during opening and closing arguments. The new allegations of prosecutorial misconduct depend on very different underlying facts and are alleged to have occurred during different times in the criminal proceeding. The purportedly false testimony by Investigator Correia was given during the *Huntley* hearing, not at trial, as Love admits in his memorandum of law (Dkt. # 42 at 34-35). The prosecutor's alleged instigation of forgery by Nurse Crasti occurred during the prosecution's case-in-chief, as did the allegedly illegal redaction of evidence in concert with trial counsel. Therefore, I find that the new claims of prosecutorial misconduct do not relate back to the original petition.

## II.    Merits of the Original Petition (Dkt. # 1)

### A.    Weight of the Evidence

Love asserts, as he did on direct appeal, that the verdict was against the weight of the credible evidence. The Appellate Division held that "although a different verdict would not have been unreasonable, the jury did not fail to give the evidence the weight it should be accorded[.]" *Love*, 134 A.D.3d at 1570 (citation omitted). Respondent contends that the weight of the evidence claim is not cognizable as it arises under state law. (*See* Dkt. # 13-1 at 12).

A federal court may grant habeas relief only on the ground that a petitioner's conviction is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). The Supreme Court thus has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); citation omitted).

A weight of the evidence claim derives from C.P.L. § 470.15(5), which grants a New York appellate court the broad factual review power to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). "Since a 'weight of the evidence claim' is purely a matter of state law, it is not cognizable on habeas review." *Cummings v. Burge*, 581 F. Supp. 2d 436, 451-52 (W.D.N.Y. 2008) (citations omitted)). Moreover, Love's specific argument in support of this claim—that Z.A.'s testimony was incredible—is not reviewable in a habeas proceeding since credibility determinations are in the sole province of the jury. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal.").

### B.    Erroneous Admission of the 911 Call Recording

#### 1.    Background

Over defense counsel's objection, the trial court granted the prosecutor's request to introduce a recording of the 911 call. On direct appeal, Love argued that the trial court committed reversible error in doing so. The Appellate Division rejected that contention, finding that the trial court properly determined that Z.A.'s statements on the 911 recording fulfilled the requirements of the "excited utterance" exception to the rule against hearsay. *Love*, 134 A.D.3d at 1570 (citation omitted). The Appellate Division found that the 911 recording as well as the victim's testimony

"established that the victim initially believed that defendant was in that car, and the recording confirms that she was frantically asking the dispatcher to send help before defendant could reach her." *Id.*

Respondent argues that this claim is unexhausted because Love did not fairly present it in federal constitutional terms to the state courts. (Dkt. # 13-1 at 13). Respondent further contends that it must be deemed exhausted and procedurally defaulted. (*Id.*). Love did not respond to these arguments in his traverse (Dkt. # 14).

### 2.    The Claim Is Unexhausted But Procedurally Defaulted

Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. 28 U.S.C. § 2254(b)(1). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In New York, *id.*, "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005) (citations omitted).

"To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the *federal* nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation and citation omitted; emphasis supplied). "Alleging lack of a fair trial does not convert every complaint about evidence . . . into a federal due process claim." *Daye v. Attorney Gen'l of State of N.Y.*, 696 F.2d 186, 193 (2d Cir. 1982) (*en banc*) (quotation omitted). Likewise, "a mere statement that 'due process' rights have been violated does not

23

necessarily give rise to a specific federal constitutional claim." *Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) (citation omitted).

In his appellate brief, Love raised several arguments under New York state evidentiary law as to why the 911 call recording was erroneously admitted. (*See* SR. 019-026). He cited only New York cases applying New York State common law in support of these arguments; he did not cite federal case law or refer to any specific provisions of the federal constitution. Nor did he mention his right to "due process" or a "fair trial," though that alone would not have been sufficient to alert the state court to a federal constitutional claim. *See Petrucelli*, 735 F.2d at 688.

Then, in his leave letter, Love again argued that the trial court's admission of the 911 call recording was erroneous as a matter of state evidentiary law. (SR. 181-184). The penultimate paragraph of the letter stated that "[p]ursuant to *O'Sullivan v Boerckel*, [*supra*]), Appellant expressly argues that this court should grant leave to appeal to review the issues of constitutional significance argued in Appellant's Brief, which are hereby incorporated by reference." (SR.184). However, Love did not identify any issues of "constitutional significance" and again cited only New York cases applying New York common law.

I agree with respondent that the evidentiary claim is unexhausted because Love did not fairly present it in federal constitutional terms to the state courts. That is, he "did not apprise the state court . . . that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (*per curiam*) (petitioner's assertion before the state court that certain testimony "was erroneously admitted because [it] was irrelevant and inflammatory, and that its admission resulted in a 'miscarriage of justice' under the California Constitution" did not fairly present evidentiary claim in federal constitutional terms) (citations omitted).

"For exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997) (quotations omitted). "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (citing 28 U.S.C. § 2254(c)). If Love were to return to state court to attempt to exhaust Ground Two, he would face an absence of corrective process. He cannot bring another direct appeal of his conviction because he has used the one request for leave to appeal to the New York Court of Appeals to which he is entitled under the state's procedural rules. *See Colon v. Connell*, No. 07 Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n.4 (S.D.N.Y. July 9, 2009) (citing N.Y. R. CT. § 500.20(a)(2); N.Y. R. CT. § 500.20(d); N.Y. Crim. Proc. Law § 460.10(5)). If Love raised Ground Two in a motion to vacate the judgment pursuant to C.P.L. § 440.10, the trial court would be required to deny it because it is a record-based claim that should have been raised on direct appeal. *Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003) (citing N.Y. Crim. Proc. Law § 440.10(2)(c)).

Because Love no longer has "remedies available" in the New York courts under 28 U.S.C. § 2254(b), he has met the statutory exhaustion requirement, *see* 28 U.S.C. § 2254(c). Accordingly, Ground Two is "deemed exhausted." *Grey*, 933 F.2d at 120-21. "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default[,]" *Gray v. Netherland*, 518 U.S. 152, 162 (1996) (citations omitted), or that the habeas court's failure to review the claim "will result in a fundamental miscarriage of justice," *Harris v. Reed*, 489 U.S. 255, 262 (1989), in other words, that the petitioner is actually, factually innocent.

### 3.      There Is No Basis to Excuse the Procedural Default

Love has not acknowledged the procedural bar issues facing his petition. In his traverse, he did not attempt to show cause for the default and resulting prejudice, and neither are apparent on the record before me. As discussed above, he does not have a colorable claim of actual innocence and therefore cannot avail himself of the fundamental miscarriage of justice exception.

### 4.      The Evidentiary Claim Asserts Only an Error of State Law

In any event, Petitioner alleges nothing more than a garden-variety claim that a state court violated a state evidentiary rule. "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis*, 497 U.S. at 780. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *Estelle*, 502 U.S. at 67-68, and therefore "an inquiry into whether the evidence at issue was correctly or incorrectly admitted pursuant to a state's evidentiary law is "no part of a federal court's habeas review of a state conviction." *Id.* at 67. Rather, the question for the habeas court is "whether the admission of the [improper] evidence violated [a petitioner]'s federal constitutional rights." *Id*. at 68. This does not occur "unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted)).

"[T]he admission even of unfairly prejudicial evidence does not violate due process unless, taken in light of the record as a whole, it was sufficiently material to have removed a reasonable doubt that would otherwise have existed as to defendant's guilt." *Vega v. Portuondo*, 120 Fed. Appx. 380, 382 (2d Cir. 2005) (unpublished opn.) (citing *Dunnigan*, 137 F.3d at 125). Love has asserted in conclusory fashion that the error in admitting the 911 call "cannot be deemed harmless"

but has never explained why this is so. He complained only that playing the 911 call set a "highly emotional tone" and "helped to bolster the [victim]'s testimony[.]" (SR. 020).

These arguments are unpersuasive. First, the record reveals that Z.A.'s statements on the 911 call were not material to Petitioner's conviction but instead were merely cumulative of her trial testimony that Petitioner forcibly raped her. Z.A.'s testimony about the rape was corroborated by Nurse Crasti's physical findings of recent sexual trauma as well as Petitioner's initial admissions to police officers that he inappropriately touched Z.A. To the extent the 911 call provided evidence of Z.A.'s emotional state, this also was corroborated by other testimony at trial. Nurse Crasti testified that when she first met Z.A. two hours after incident, Z.A. was still very upset and continued crying and sobbing throughout the examination. Investigator Correia investigator, also observed Z.A. at the hospital and said she was very emotional, crying and gasping for breath. In addition, Willie Mae, Petitioner's mother, testified that she and Z.A. both were crying while they waited near the payphone for the police to arrive. Taken in light of the record as a whole, the 911 call did not remove an otherwise existing reasonable doubt as to his guilt. *Vega*, 120 Fed. Appx. at 382.

Finally, any potential bolstering effect of the 911 call does not transform its admission into a due process violation. It is well settled that "the rule against bolstering is a creature of New York evidentiary law, not a constitutional matter." *Brewer v. Eckert*, No. 19-CV-6486-FPG, 2020 WL 10061923, at *17 (W.D.N.Y. Sept. 10, 2020) (citing *Glover v. Burge*, 652 F. Supp. 2d 373, 377 (W.D.N.Y. 2009) ("[T]he overwhelming weight of federal authority in this Circuit holds that 'bolstering' of a prosecution witness's testimony does not state a constitutional claim redressable on federal habeas review.")).

### C.        Prosecutorial Misconduct

Petitioner complains that the prosecutor committed two instances of misconduct. First, in her opening, she told the jury to "[l]ook for any motive to lie" when Z.A. testified. (T. 206). Second, during her summation, she argued that "[t]he person without motive, that's the girl you saw come in and testify before you. That was another factor that people look to when judging credibility, there's a motive to lie. Have you heard one?" (T. 425). According to Petitioner, these remarks argument improperly shifted the burden of proof to the defense and implicitly vouched for the victim's credibility.

The Appellate Division held that Petitioner failed to preserve by objection his contention that the prosecutor's comments "deprived him of a fair trial[.]" *Love*, 134 A.D.3d at 170 (citing N.Y. Crim. Proc. Law § 470.05(2)). Alternatively, it held, the summation remarks were "fair response to defense counsel's summation." *Id.* (citations omitted). Finally, "[e]ven assuming, *arguendo*, that the prosecutor's comments during opening statements or on summation were improper," the Appellate Division found "they were not so egregious as to deprive defendant of a fair trial[.]" *Id.* at 1570-71 (citations omitted).

Respondent contends that the prosecutorial misconduct claim is procedurally barred on two grounds. First, Petitioner failed to fully exhaust the claim by raising it in his application for leave to appeal. Second, the Appellate Division relied on an adequate and independent state ground—C.P.L. § 470.05(2), the contemporaneous objection rule—to dismiss it. (*See* Docket # 13-1 at 17). As discussed below, I agree that the prosecutorial misconduct claim is unexhausted but must be deemed exhausted and procedurally defaulted. For this reason, I need not reach respondent's argument based on the Appellate Division's rejection of the claim as unpreserved.

The Second Circuit's decision in *Jordan v. Lefevre*, 206 F.3d 196 (2d Cir. 2000), dictates the outcome here. In *Jordan*, the petitioner "forcefully argued" one claim in the first three paragraphs of his leave application but made no reference to his other claims. In the fourth paragraph of the leave application, he requested permission to appeal "[f]or all of these reasons and the reasons set forth in his Appellate Division briefs." *Id.* at 198 (quotation marks omitted; alteration in original). The panel concluded that "[a]rguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised d[id] not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction." *Id.* at 198-99.

Although Love presented his prosecutorial misconduct claim in his appellate brief, he did not refer to it in the application for leave to appeal. Instead, appellate counsel's letter announced that "[*t*]*he question* on this appeal is whether the trial court properly admitted hearsay evidence under the excited utterance exception." (SR. 181) (emphasis supplied). And, as noted above, counsel's argument for obtaining leave focused exclusively on the evidentiary issue involving the 911 call. (SR. 181-84). At the very end of the letter that counsel requested review on unspecified "issues of constitutional significance argued" in the appellate brief (SR. 184), which was being enclosed (SR. 181). Since the leave application argued the evidentiary claim involving the 911 call "at length" and made "only passing reference to possible other claims [of constitutional significance] to be found in the attached briefs," *Jordan*, 206 F.3d at 198, it did "not fairly apprise the state court of those remaining claims" in the appellate briefs. *Id.* The prosecutorial misconduct claim is thus unexhausted because Petitioner failed to present it "to the highest court of the state." *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000).

For the same reasons as discussed above in connection with the evidentiary claim, Love faces an absence of corrective process in state court to exhaust this record-based prosecutorial misconduct claim. However, his forfeiture bars him from litigating the claim's merits in this habeas proceeding, absent a showing of cause and prejudice, or a fundamental miscarriage of justice. *Id.* (citations omitted). There is no basis for excusing the procedural default because cause and prejudice are absent from this record, and Love does not have a gateway claim of actual innocence to fulfill the fundamental miscarriage of justice exception.

In any event, the claim is meritless. A prosecutor's remarks, even if "undesirable or even universally condemned," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), are insufficient to justify reversing a conviction in an otherwise fair proceeding. Instead, "the prosecutor's comments [must have] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quotation omitted).

It is well settled that "[p]rosecutors have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility." *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998). Here, undermining Z.A.'s credibility was the crux of the defense strategy. Trial counsel argued that apart from Z.A.'s testimony, there was scant physical evidence that she had been raped. Trial counsel posited that Z.A. falsely accused her father out of resentment over their years of estrangement, and over the fact that he had gone out drinking with his friends instead of spending time with her that night. Counsel argued that, once she reported the rape to the police, she could not "put this genie back in the bottle," and her story took on a life of its own. Trial counsel criticized Z.A.'s demeanor, asserting that she refused to make eye contact and answered in barely audible monosyllables. He described not only her story but her body language as "not credible" and urged the jury to find that she was "not a credible witness." (*See* T. 396-405, 411-14).

Courts have routinely found that it is not improper for a prosecutor to ask jurors to consider what motive a state's witness had to lie or fabricate, particularly where—as here—the defense has attacked that witness' credibility. *See*, *e.g.*, *Perez*, 144 F.3d at 210 (finding "no merit" in defendant's argument that it was "unfair for the prosecution to tell the jury that its witnesses had no motive to lie") (citation omitted); *Everett v. Fischer*, No. 00-CV-6300 (NG), 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) (finding that prosecutor did not shift the burden of proof or improperly vouch for the state's witnesses by pointing out that they had no motive to lie) (citing *Connery v. State of N.Y.*, No. 93 CIV. 1448 (PNL), 1993 WL 119797, at *1 (S.D.N.Y. Apr. 13, 1993) ("perfectly reasonable" for a prosecutor to assert in closing argument that a witness "had no reason to lie")). Under the circumstances, Petitioner has failed to show that the prosecutor's comments were improper, let alone so fundamentally unfair as to render his conviction a denial of due process.

### D.     Ineffective Assistance of Trial Counsel

Love asserts that trial counsel was ineffective in failing to utilize a picture posted on Facebook by Z.A. that apparently was provided to counsel by one of his friends in December of 2010. The image depicts Z.A. with the words, "ee ii consider maa self innocent until proven guiltee" superimposed over the image. (SR. 204). In his first § 440 motion (SR. 187-205), Petitioner argued that "[d]efense counsel of course did nothing with this material information nor did he consult an expert witness in the field of child psycology [sic] as to its significance." (SR. 194).

In its order denying the motion (SR. 262-64), the state court found that Love did not clearly explain how or why this picture would have been relevant at trial, but it "infer[red] from his moving papers that perhaps he feels his counsel should have argued to the jury that [Z.A.]'s weight

contradicts her testimony regarding the 'forcible compulsion' element of rape in the first degree. . . ." (SR. 262). In any event, the state court found, even assuming the picture would have been admissible at trial, a strategic decision by counsel not to use it was "certainly reasonable" since the jury was able to observe Z.A.'s and Petitioner's relative weights. (*Id.*).

In his application for leave to appeal the denial of the C.P.L. § 440.10 motion, Petitioner explained that the Facebook picture was submitted "for one reason. Defendant and everyone else who has seen this picture and the words so boldly written across it suggests that [Z.A.], defendant's daughter is a disturbed child who has fabricated rape charges against her father." (SR. 270). He reiterated that trial counsel was ineffective for failing to consult with an expert in the field of child psychology about the Facebook post. (SR. 271).

Now, in the petition, Petitioner states that by posting the captioned photograph of herself, Z.A. intended to communicate, "I said it [i.e., petitioner raped her] and you can't prove I'm lying." (Dkt # 1 at 61). He theorizes that if trial counsel had shown the Facebook post to an expert in child psychology, the expert would have been able to provide favorable opinion testimony on his behalf. (*Id.*). Respondent argues that the "somewhat detailed" claim that now raised in the petition is different from the "unexplained" claim that he raised in the first § 440 motion, and therefore it is unexhausted. (Dkt # 13-1 at 21). Petitioner responds that it is not his fault the state court did not understand the nature of his claim and that, in any event, his application to the Appellate Division had "the same factual arguments and legal theories that [his] federal application has." (Dkt. # 14).

"In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Daye*, 696 F.2d at 191 (citations omitted). "Specifically, he must have set forth in state court all of the essential factual allegations asserted in his federal petition[,]" as well as

"essentially the same legal doctrine he asserts in his federal petition." *Id.* at 191-92 (citations omitted). A claim will not be found unexhausted "when evidence presented for the first time in a habeas proceeding supplements, but does not fundamentally alter, the claim presented to the state courts." *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994) (finding that new allegations of attorney's drug use and its effect on attorney's performance were not "merely supplemental" to claim of ineffective assistance) (citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)).

In the first C.P.L. § 440.10 motion, Love faulted trial counsel because he failed to consult with an expert in psychology about the significance of the Facebook post. (SR. 194). Similarly, in the petition, he states that trial counsel should have shown the Facebook post to an expert in child psychology. Thus, he has asserted the same factual basis (failure to consult with an expert about the Facebook post) and legal doctrine (ineffective assistance of counsel) in both state court and federal court. This is not a case where petitioner has come to federal court with new evidence, or even new allegations of ineffective assistance. Rather, he has simply articulated why he believes the Facebook post was important to his case. The explanation may have made his ineffectiveness claim less opaque, but it did not "'cast [the ineffective assistance] claim in a significantly different light.'" *Caballero*, 42 F.3d at 741 (quotation omitted; alteration in original); *see also*, *e.g.*, *Simmons v. Epps*, 381 Fed. Appx. 339, 346 (5th Cir. 2010) (new evidence did not render claim unexhausted where it "primarily serve[d] to reinforce topics that Simmons presented to the state court . . . and that his attorneys failed to investigate these topics adequately"; although "some of the evidence gives additional details, it does not fundamentally alter the claim presented to the state court").

Having found that the ineffective assistance claim has been exhausted, I must consider what standard of review to apply. This petition is subject to the limitations on relief set forth in 28

U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Id.* at 98. There is a presumption, rebuttable "in some limited circumstances," that the state courts adjudicated a petitioner's claim on the merits. *Johnson v. Williams*, 568 U.S. 289, 298, 301 (2013). If "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court," *id.* at 303, there was no "adjudication on the merits" for purposes of § 2254(d). *Id.* The habeas court "look[s] 'to the last reasoned decision' that resolves the claim at issue in order to determine whether that claim was adjudicated on the merits. *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)).

The trial court issued the last reasoned state court opinion on Petitioner's ineffectiveness claim. Rather than "inadvertently overlook[ing]" the claim, the court discerned the claim but did not interpret it as Petitioner intended. In such circumstances, courts are divided as to whether there has been an adjudication on the merits. *Compare Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir. 2002) (explaining that "if an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply"), *with Smith v. Cook*, 956 F.3d 377, 386-87 (6th Cir. 2020) ("We have held that *Johnson*'s presumption prevails when a state court imperfectly discusses, rather than omits, a petitioner's federal claim. . . . Although Smith contends that the state court misunderstood his claim, he has not shown that his claim was 'overlooked.'"), *cert. denied*, 141 S. Ct. 1111 (2021). Because the standard of review is not outcome-determinative here, I will review the claim *de novo*. *See, e.g., Washington v. Schriver*,

255 F.3d 45, 55 (2d Cir. 2001) ("We need not and do not resolve today the question of whether § 2254(d)'s standard of review applies because nothing turns on it here.").

To establish deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner must overcome the "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance, *id.* at 689, by showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. With respect to prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. An ineffectiveness claim "must be rejected if the [petitioner] fails to meet either the performance prong or the prejudice prong." *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011) (citing *Strickland*, 466 U.S. at 687, 697).

Whether to call witnesses, and which witnesses to call, are the types of strategic decisions by counsel that courts, even on direct review, are loath to second-guess. *See United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'") (citations omitted), *cert. denied*, 532 U.S. 1007 (2001). "[T]here is no *per se* rule that requires trial attorneys to seek out an expert." *Gersten v. Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005).

As best as I can discern, Love thinks that trial counsel should have called an expert in child psychology to testify that Z.A.'s Facebook post demonstrated that she was fabricating the rape allegations. This claim is founded on pure speculation. Love has offered no proof that there was an expert willing to provide opinion testimony to that effect. He accordingly cannot demonstrate that he was prejudiced by trial counsel's decision. *See Mills v. Lempke*, No. 11-CV-0440 MAT,

2013 WL 435477, at *54 (W.D.N.Y. Feb. 4, 2013) (petitioner's contention that outcome of trial would have been different was "based on nothing more than [his] own speculative assertions" since petitioner had "not come forward with affidavits or other admissible evidence showing that there was, indeed, an expert witness who would have testified as he hoped").

Moreover, courts consistently have held that an expert witness cannot offer an opinion on whether a witness is lying or untruthful. *See Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005) ("It is a well-recognized principle of our trial system that determining the weight and credibility of [a witness's] testimony. . . belongs to the jury. . . . Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible. . . . ") (internal quotation, quotation marks, and citations omitted); *United States v. Azure*, 801 F.2d 336, 339 (8th Cir. 1986) (reversing conviction for child sexual abuse after pediatrician testified that victim "was believable and that he could 'see no reason why she would not be telling the truth'" because testimony invaded exclusive province of jury to determine witness credibility); *cf. Gilson v. Sirmons*, 520 F.3d 1196, 1243 (10th Cir. 2008) (denying habeas relief, under a *de novo* standard of review, on claim that state court erred in excluding expert testimony stating certain child witnesses were not credible because credibility of another person is inappropriate subject for expert opinion testimony). It was entirely reasonable for trial counsel not to pursue an expert opinion that would been inadmissible at trial. Because counsel's decision not to call an expert in child psychology was objectively reasonable and did not prejudice the defense, the *Strickland* claim fails.

**III.     The Requests for Appointment of Counsel and an Evidentiary Hearing**

Love has asked for an evidentiary hearing on his actual innocence claim. (Dkt # 42 at 16, 19, 21). The Supreme Court has explained that "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief," it "follows that a district court is not required to hold an evidentiary hearing." *Id.*

As discussed above, the record flatly refutes the viability of Love's actual innocence as a "gateway" claim through which his untimely proposed amended claims and his timely but procedurally defaulted claims may pass. I have denied his request to amend the petition to add an actual innocence claim because such a claim is not a cognizable basis for relief from custody under the habeas statute. Furthermore, to the extent he may be requesting an evidentiary hearing as to his other claims, the record establishes that the claims in the original petition are without merit. For all of these reasons, it would be an abuse of discretion to grant an evidentiary hearing.

Rule 8(c) of the Rules Governing Section 2254 Petitions in the District Courts mandates that if a district court grants an evidentiary hearing, it must appoint counsel for a qualifying petitioner under 18 U.S.C. § 3006A. Since I am declining to hold an evidentiary hearing, there is no requirement that counsel be appointed for Love. Moreover, since the petition is resolvable on the present record against him, I find that it would be an abuse of discretion to appoint counsel.

**CONCLUSION**

For the reasons stated above, the motion to amend (Dkt. # 42) is DENIED, the requests for appointment of counsel and an evidentiary hearing (Dkt. # 42) are DENIED, and the petition (Dkt. # 1) is DISMISSED. Because Love has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       June 10, 2022.